# UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2019 DEC -6 AM 9:10
MARGARET BOTKINS, CLERK
CHEYENNE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>**BRYAN JONES and JEFFREY FILLERS,**<br><br>Defendant. | **CRIMINAL COMPLAINT**<br><br>**UNDER SEAL**<br><br>Case Number: 19-MJ-104-S |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

### COUNT ONE

From January 2008, through and including the date of this Complaint, in the District of Wyoming and elsewhere, the Defendants, **BRYAN JONES and JEFFREY FILLERS** did knowingly, intentionally and unlawfully combine, conspire, confederate, and agree together and with other persons known and unknown to distribute marijuana, a Schedule I controlled substance.

In violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C).

### COUNT TWO

From January 2008, through and including the date of this Complaint, in the District of Wyoming and elsewhere, the Defendants **BRYAN JONES** and **JEFFREY FILLERS**, did knowingly combine, conspire, confederate and agree with each other and with other persons known and unknown to commit offenses against the United States in violation of Title 18 United States Code §§ 1956 and 1957, to wit:

(A) to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which involved the proceeds of specified unlawful activity, that is distribution and possession with intent to distribute marijuana in violation of Title 21, United States Code, Section 841(a)(1) and conspiracy to distribute and possess with intent to distribute marijuana in violation of Title 21, United States Code, Section 846, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location source, ownership, and control of the proceeds of said specified unlawful activity, and that

while conducting and attempting to conduct such financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(B) to knowingly engage in monetary transactions by, through or to a financial institution, affecting interstate commerce in criminally derived property of a value greater than $10,000, such funds having been derived from a specified unlawful activity, that is distribution and possession with intent to distribute marijuana in violation of Title 21, United States Code, Section 841(a)(1) and conspiracy to distribute and possess with intent to distribute marijuana in violation of Title 21, United States Code, Section 846, in violation of Title 18, United States Code, Section 1957.

All in violation of 18 U.S.C. § 1956(h).

I further state that I am a Special Agent with the U.S. Drug Enforcement Administration and that this complaint is based on the following facts:

*(See attached Sworn Statement Justin C. Vanderbilt)*

Continued on the attached sheet and made a part hereof.

_____
Signature of Complainant
JUSTIN C. VANDERBILT

Sworn to before me and subscribed by telephone,

December 6, 2019      at      Cheyenne, Wyoming
Date                                    City and State
p

HON. KELLY H. RANKIN
Magistrate Judge, United States
District Court
Name & Title of Judicial Officer                Signature of Judicial Officer

2

# AFFIDAVIT OF JUSTIN C. VANDERBILT IN SUPPORT OF CRIMINAL COMPLAINT

*UNITED STATES v. BRYAN JONES AND JEFFREY FILLERS*

I, Justin C. Vanderbilt, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent of the United States Department of Justice Drug Enforcement Administration (DEA) who is engaged in enforcing the criminal laws of the United States. I am a criminal investigator of the United States within the meaning of Title 21, United States Code, Section 878, and therefore am empowered to conduct investigations of, and make arrests for, the offenses enumerated in Title 21 and Title 18 of the United States Code. Accordingly, within the meaning of Title 18, United States Code, Section 2510(7), I am an investigative or law enforcement officer of the United States, empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I have been a Special Agent of the DEA since September 2005. In February of 2014, I was assigned to the DEA Casper Post of Duty as a Special Agent dealing primarily with investigations related to violations of United States Code Title 21. I was previously assigned to the DEA Foreign-deployed Advisory Support Team for approximately four years, and assigned to the DEA Laredo District Office for approximately four years prior to that.

3. While employed with the DEA, I have received sixteen weeks of training at the DEA Academy in Quantico, Virginia. This training included, in part: identification of various types of controlled substances by sight and odor; the way in which controlled substances are packaged, marketed, and consumed; drug testing; informant handling; evidence handling; search and seizure law; law involving conspiracy; and surveillance and investigative techniques.

4. I have conducted, and participated in, investigations into the unlawful importation, distribution, and possession with intent to distribute, controlled substances; and the unlawful diversion of controlled substances outside of a legitimate closed distribution network (pharmaceutical/medical controlled substance diversion). I have also been the affiant of, and/or a participant in, the execution of arrest warrants and search warrants involving the seizure of controlled substances, documents associated with the sale of controlled substances, and proceeds from the sale of controlled substances. I have also participated in drug related wire-tap investigations. I have conducted surveillance, performed undercover activities, conducted searches and seizures, and made arrests. Throughout my career, I have worked closely with other DEA special agents and other federal, state, and local law enforcement officers with many years of drug investigative experience.

5. This affidavit is based on personal knowledge derived from participation in this investigation, the knowledge of other law enforcement officers, cooperating defendants, co-conspirators and confidential sources as well as documents provided to me in my official capacity. The information set forth in this affidavit is being submitted for the limited purpose of establishing probable cause for the complaint and does not reflect all of the information known by me or other investigators or officers involved in this investigation.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that Bryan JONES (JONES) and Jeffrey FILLERS (FILLERS) have violated Title 21 §§ 846 and 841(a)(1) and (b)(1)(C), Conspiracy to Distribute Controlled Substances and Title 18 §1965(h), Conspiracy to Launder Monetary Instruments.

## STATEMENT OF PROBABLE CAUSE

7.  I know drug trafficking organizations often use private/commercial vehicles, and hidden compartments within those vehicles, to transport illicit drugs and drug proceeds. I know drug trafficking organizations often use private/commercial property as locations to store/hide illicit drugs and drug proceeds. I know drug trafficking organizations will often attempt to legitimize their drug proceeds via money laundering techniques. I know drug traffickers will often use false or fictitious identities. I know drug traffickers will go to great lengths to conceal their illegal activities from detection by law enforcement.

8.  On October 31, 2016, an investigation was initiated by the Drug Enforcement Administration (DEA) into the JONES Drug Trafficking Organization (DTO). Information received from law enforcement sources in Jackson, Wyoming, indicated that JONES was trafficking large quantities of marijuana in the Jackson, Wyoming, area. Investigators discovered that on February 7, 2014, co-conspirator 1 (CC1) was arrested in Lincoln, Nebraska, with approximately $189,000 in United States currency (USC). According to a report by another federal agency, CC1 said that $126,000 of the cash found in his/her vehicle belonged to JONES. CC1 told investigators that he/she had transported marijuana to Albany, New York, and the money seized from CC1 was proceeds from the sale of marijuana. CC1 told investigators that JONES and CC1 were partners in a marijuana growing operation in Oregon and that JONES found buyers for the bulk marijuana. Law enforcement investigators in Oregon conducted a search at the property identified by CC1, 13501 Water Gap Road in Williams, Oregon, and seized approximately 400 pounds of marijuana. CC1 indicated that he/she had transported approximately 100 pounds of marijuana the previous year to Albany, New York, for JONES and returned to

Oregon with the proceeds of that sale. CC1 told investigators that JONES lived in Jackson, Wyoming.

9. Investigators obtained information from investigators with DEA in Albany, New York, detailing information received from confidential source 1[1] (CS1) in 2015. CS1 had recently traveled to Oregon with co-conspirator 2 (CC2) for the purpose of meeting CC2's marijuana source of supply. CS1 stated that he/she met the source of supply in Oregon and identified JONES from Jackson, Wyoming, as the marijuana source of supply for CC2.

10. Investigators obtained additional information from another federal agency, which detailed an incident on December 9, 2015, in which approximately $519,000 in cash was seized from an aircraft in Evanston, Wyoming. The report detailed the subsequent interview of the pilot, co-conspirator 3 (CC3), who identified JONES as a marijuana distributor from Jackson, Wyoming. CC3 indicated that JONES grew marijuana on property in Oregon and distributed that marijuana in New York. CC3 stated that JONES lived in Jackson, Wyoming, and owned a restaurant there.[2]

11. Through this investigation, investigators have learned that JONES lives at 2385 Grand Teton Circle in Jackson, Wyoming. The home was purchased by JONES and the mother

---

[1] CS1 has supplied information to law enforcement on multiple occasions concerning the underlying investigation in this case. The CS1's information has proven accurate and reliable on multiple occasions, and is often quite detailed. Information supplied by the CS1 has been corroborated through traditional investigative techniques such as physical surveillance observations and interviews of related parties. Based upon discussions with fellow law enforcement personnel and my personal observations and experience, information supplied by the CS1 has been reliable and accurate and can be regarded as such. Further, based on the investigative teams observations, and discussion with other law enforcement agents, information supplied by the CS1 can be regarded as information which, if disclosed among criminal suspects, would likely reveal CS1's role as a cooperator, because only a limited set of people know the information CS1 has disclosed to authorities. It is my assessment, as well as that of other law enforcement officers directly dealing with the CS1 that the CS1's life and safety (and CS1's family, whether in the United States or elsewhere) could be jeopardized through violent retaliation should the CS1's role as a cooperator become public prematurely.

[2] JONES' significant other, Amy Young, was the proprietor of The Lotus Café.

4

of JONES' children, Amy Young in 2014. This is his primary residence. Investigators have not identified any other residences or places of business or employment for JONES in the area.

12. On January 4, 2018, while conducting surveillance at JONES' residence, located at 2385 Grand Teton Circle in Jackson, Wyoming, investigators observed an individual resembling CC2 at the residence along with a rental car. A subsequent check of the rental history revealed that the vehicle was rented by CC2 from the Denver International Airport. Investigators in the DEA Albany, New York, office confirmed that CC2 was a large-scale marijuana distributor in the Albany, New York, area.

13. On January 12, 2018, surveillance units again observed CC2 at JONES' residence in Jackson, Wyoming, however CC2 was driving a red Toyota Tundra pickup pulling a white Mercedes station wagon on a flatbed U-Haul trailer. Records subsequently obtained from U-Haul indicated that CC2 had rented the trailer in Rogue River, Oregon, on January 11, 2018, and the trailer was returned to a U-Haul location in Jackson, Wyoming. Location data obtained for the phone of CC2 indicated that on January 11, 2018, CC2's phone was in the Medford, Oregon, area, then in Jackson, Wyoming, on January 12 and 13, 2018, and finally near Albany, New York, the night of January 13, 2018.

14. On March 30, 2018, DEA surveillance units in Bend, Oregon, observed JONES meet with CC2 at the Red Lion Hotel. Surveillance units observed JONES and CC2 depart the hotel in a silver Ford F-350 bearing Wyoming license plate 22-5557, which was registered to JONES. Photos of JONES and CC2 were obtained by surveillance units and confirmed by investigators to be JONES and CC2.

15. On May 6, 2018, investigators conducted an interview with CC3. CC3 told investigators that he/she met JONES through a mutual friend around 2014 and that JONES asked

5

CC3 to fly money for JONES. CC3 stated that JONES told him/her that JONES had a marijuana growing operation in Oregon. CC3 indicated that after meeting JONES he/she began flying JONES around between Idaho, Oregon, California and New York. CC3 stated that JONES and another individual had a marijuana grow site in the Humboldt, California, area. CC3 stated that he/she flew money for JONES approximately four times and that JONES accompanied CC3 on two flights. CC3 indicated that JONES was a marijuana supplier and possibly a marijuana broker as well. CC3 stated that JONES paid him/her $12,000 plus expenses for each trip to fly JONES' money across the country. Investigators were able to corroborate some of CC3's flight information based on fuel records in Wyoming and Idaho which were associated to the tail number of CC3's aircraft.

16. Investigators identified multiple properties in Oregon that were owned by JONES and FILLERS. On May 10, 2018, investigators conducted surveillance at 12959 Water Gap Road in Williams, Oregon, a property owned by FILLERS, however due to dense tree cover, investigators were unable to verify whether or not an active marijuana grow existed.

17. On May 11, 2018, investigators conducted surveillance at 26695 Horsell Road in Bend, Oregon, a property owned by FILLERS until November 4, 2019. Investigators were able to observe three large greenhouses commonly used to cultivate marijuana located behind privacy fences.

18. Investigators learned through Douglas County Oregon records that 6586, 6588 and 6900 Upper Cow Creek Road in Azalea, Oregon, were owned by JONES and co-conspirator 4 (CC4). On May 8, 2018, investigators conducted surveillance at these properties and observed what appeared to be an active marijuana growing operation. Some areas of the properties were obscured by trees, however investigators were able to observe plants resembling marijuana plants.

On May 15, 2018, investigators obtained four cellular phones seized by law enforcement in Oregon from 6588 Upper Cow Creek Road in Azalea, Oregon. The phones had initially been seized in October of 2017 during a search warrant at 6588 Upper Cow Creek Road in Azalea, Oregon, which was conducted by the Douglas Interagency Narcotics Task Force. The search warrant was a result of an observed illegal marijuana grow operation. A search warrant was obtained by investigators for the phones and the data contained on the phones was extracted. Investigators learned that the phones belonged to CC4. Investigators were able to determine that CC4 was from the Jackson, Wyoming, area. CC4, through text message analysis, was believed to be the marijuana grow operations manager for JONES at this property in Azalea, Oregon. Investigators reviewed text messages from June 13, 2017, through August 11, 2017, which had been extracted from the seized phones which indicated that JONES directed CC4 to have marijuana from the Cow Creek property packaged and ready so it could be picked up by another individual and transported to Bend, Oregon. Additionally, text messages between JONES and CC4 indicated that JONES and CC2 were responsible for paying workers at the Azalea, Oregon, property and for supplies used to cultivate and process marijuana for distribution. The text message conversations also indicated that JONES and CC2 periodically traveled to the Azalea, Oregon, property to check on the operation.

19. In August of 2018, investigators learned from confidential source 2[3] (CS2) that JONES was utilizing his brother-in-law, later identified as FILLERS, to launder proceeds from the

---

[3] CS2 has supplied information to law enforcement on multiple occasions concerning the underlying investigation in this case. The CS2's information has proven accurate and reliable on multiple occasions, and is often quite detailed. Information supplied by the CS2 has been corroborated through traditional investigative techniques such as physical surveillance observations and interviews of related parties. Based upon discussions with fellow law enforcement personnel and my personal observations and experience, information supplied by the CS2 has been reliable and accurate and can be regarded as such. Further, based on the investigative teams observations, and discussion with other law enforcement agents, information supplied by the CS2 can be regarded as information

7

sale of marijuana through FILLERS' business, Jeffrey Fillers Homes, LLC (FILLERS HOMES). CS2 indicated that JONES paid different individuals to transport money and marijuana across the country. CS2 stated that he/she had sold marijuana to JONES and was paid cash for the marijuana. CS2 knew that JONES had multiple marijuana grow operations in Oregon and that JONES supplied a marijuana distributor in New York. CS2 identified the New York distributor as CC2. CS2 also stated that he/she knew that JONES had lost large amounts of bulk currency during transport from the east coast back to JONES.

20. In December of 2018, investigators learned through CS2 that JONES sold marijuana in the Jackson, Wyoming, area. Additionally, investigators learned from CS2 that JONES had been utilizing a transportation company to transport marijuana.

21. On February 6, 2019, a white Ford F-350 was observed at 218 Pleasant Valley Estates Drive in Eureka, Missouri, the residence of FILLERS. An individual was observed taking a large duffel bag from the pickup and entering the FILLERS residence. The pickup resembled a white Ford F-350 pickup owned by co-conspirator 5 (CC5), owner and operator of the transportation company. A registration check was conducted based on the license plate of the pickup which revealed that the pickup was registered to the transportation company owned and operated by CC5. A historical analysis of call history for phone number XXX-XXX-4032, subscribed to FILLERS, revealed that FILLERS had 208 communications with phone number XXX-XXX-0261, subscribed to the transportation company from November 12, 2018 to November 15, 2019.

---

which, if disclosed among criminal suspects, would likely reveal CS2's role as a cooperator, because only a limited set of people know the information CS2 has disclosed to authorities. It is my assessment, as well as that of other law enforcement officers directly dealing with the CS2 that the CS2's life and safety (and CS2's family, whether in the United States or elsewhere) could be jeopardized through violent retaliation should the CS2's role as a cooperator become public prematurely.

8

22. In March of 2019, investigators analyzed financial documents from Wells Fargo and observed that on March 4, 2019, and March 18, 2019, CC4 made two $5,000 wire transfers to a First Community National Bank account owned by FILLERS HOMES. Investigators obtained text message records from a phone number known to be utilized by CC4 and observed text message conversations in which a phone number known to be utilized by JONES provided CC4 with the wiring instructions for FILLERS HOMES. Investigators also observed a message from JONES to CC4 in which JONES indicated that CC4 could pay by means other than a wire transfer. JONES indicated in the text message that sending a wire is a paper trail. JONES told CC4 in another text message that CC4 could pay via Apple Pay and gave CC4 a phone number to make a payment to. The phone number JONES provided was XXX-XXX-4032, which was subscribed to FILLERS. Investigators obtained and analyzed historical email records between CC4 and JONES. Investigators observed email conversations in which JONES told CC4 that for $30,000 CC4 would get a deeded lot and for an additional $120,000 a home would be built on the lot for CC4. JONES went on to indicate that the homes are then listed for $185,000 to $205,000 and that they sell pretty fast. JONES offered CC4 to buy into this property in Tennessee through a "deed guy" in St. Louis, Missouri. Investigators know that FILLERS lived in Eureka, Missouri, which is near St. Louis, Missouri. Investigators were able to locate property in Greeneville, Tennessee, in the name of FILLERS HOMES, which had been subdivided into numerous lots. Investigators determined that homes were indeed built on some of the lots and sold near the price point JONES outlined in the email conversation with CC4. Based on training and experience, I believe that the aforementioned text message and email conversations outline a money-laundering scheme for the drug trafficking organization's marijuana proceeds.

23. On April 16, 2019, investigators learned from flight records that CC4 flew from Jackson, Wyoming, to St. Louis, Missouri. Surveillance was established on CC4 in St. Louis and surveillance units observed CC4 travel to a closed business and go inside. Investigators observed CC4 leave this location with FILLERS and get into a black Ford Raptor, registered to FILLERS. Surveillance units observed CC4 and FILLERS travel to a restaurant in Eureka, Missouri. Surveillance was established in the restaurant and units observed FILLERS and CC4 meet with co-conspirator 6 (CC6). Surveillance units observed FILLERS, CC4 and CC6 leave the restaurant a short time later at which time FILLERS, CC4 and CC6 returned to the closed business and went inside. Surveillance units observed CC4 leave alone a short time later and travel to a hotel in St. Louis, Missouri. Flight records indicated that CC4 returned to Jackson, Wyoming, the next day.

24. On October 1, 2019, investigators conducted a proffer of co-conspirator 7 (CC7) in Albany, New York. CC7 stated that CC7 and CC2 had been friends for many years. CC7 knew CC2 to be involved in the distribution of marijuana and CC7 admitted to having purchased marijuana from CC2 for personal use. CC7 indicated that he/she allowed CC2 to store marijuana and vehicles at CC7's property in New York in exchange for marijuana. CC7 stated that a trucking company would pick up vehicles from CC2 which CC7 believed contained money. Investigators believe that the trucking company CC7 described to be the transportation company owned and operated by CC5. CC7 stated that on one occasion at night, CC7 accompanied CC2 to meet the truck driver at which time CC2 dropped off a silver Toyota Tundra to the driver. CC7 described the driver as an average sized white male with a strong southern accent. CC7 observed that the individual was driving a white dual-wheeled pickup with a trailer that could carry two or three vehicles. CC7 stated that he/she understood that money was being shipped in the vehicle. CC7 stated that CC2 told him/her that the vehicles shipped through the transportation company were

10

funded by JONES so that money could be sent west. CC7 estimated that approximately six vehicles were stored at CC7's property and subsequently sent west with the transportation company. CC7 stated that he/she met JONES through CC2 when CC7 lived in Colorado. CC7 positively identified a photograph of JONES. CC7 stated that CC2 and JONES were friends and that JONES had a reputation as a skilled marijuana grower. CC7 stated that JONES lived in Jackson Hole, Wyoming, and that JONES' wife owned a restaurant there. CC7 indicated that CC2 told CC7 that JONES owned property in Idaho and a farm in Oregon. CC7 believed that JONES came to New York sometime between 2005 and 2007 and stayed with CC2. CC7 indicated that JONES was involved in real estate and had a home in Jackson, Wyoming.

25. On October 23, 2019, investigators conducted an interview with CC1. CC1 stated that he/she had met JONES through a mutual friend in 2008. CC1 was initially provided with JONES' phone number by this mutual friend and CC1 subsequently contacted JONES about purchasing marijuana from CC1. CC1 stated that JONES came to CC1's property in Oregon and purchased one hundred pounds of marijuana for approximately $2,200 per pound, totaling approximately $220,000. CC1 indicated that JONES paid cash for the marijuana. CC1 stated that for the next three to four years JONES purchased marijuana from CC1. CC1 stated that JONES purchased anywhere from one hundred pounds to over one hundred and fifty pounds per year from CC1. CC1 stated that JONES always paid cash for the marijuana. CC1 stated that JONES also purchased additional marijuana from other growers in the area. CC1 stated that around 2010, JONES paid $150,000 in cash to lease a marijuana growing operation in Williams, Oregon. CC1 stated that he/she had transported marijuana to Albany, New York, and also brought back money from Albany, New York, for JONES. CC1 indicated that JONES had contacts in New York who would purchase the marijuana and send cash back to JONES.

26. CC1 stated that JONES lived in Jackson, Wyoming, and that JONES and his wife lived in Williams, Oregon, for a period of time. CC1 stated that he/she had transported marijuana to JONES in Jackson, Wyoming, as well. CC1 stated that he/she had also picked up money from JONES at a golf course in Jackson, Wyoming. CC1 stated that in 2011 JONES purchased a property located in Williams, Oregon, for approximately $300,000, which JONES paid for in cash. CC1 stated that JONES established a large marijuana grow operation on the property. CC1 stated that JONES utilized indoor growing rooms on this property which produced a harvestable marijuana crop approximately every three months. CC1 stated that JONES had quitclaimed the property into another individual's name, however CC1 did not know the name of that individual.

27. Investigators obtained records from First American Title Company for a property located at 12959 Water Gap Road in Williams, Oregon. The records indicated that this property was quitclaimed from the previous owner into the name of FILLERS on August 16, 2011. The records indicated that on March 1, 2013, the same property was quitclaimed from FILLERS to JONES. Finally on May 22, 2014, the same property was quitclaimed from JONES to FILLERS HOMES. Investigators found that on May 20, 2014, JONES signed the quitclaim deed and it was notarized by a notary in Teton County, Wyoming. Shortly after the quitclaim, on June 6, 2014, FILLER HOMES utilized 12959 Water Gap Road as collateral to obtain a $303,000 loan from First Community National Bank. Investigators discovered that on August, 4, 2014, FILLERS wired $300,000 to Teton Law Group, LLC in Jackson, Wyoming, from his FILLERS HOMES, account at First Community National Bank. During a review of Gmail records from the email account of JONES, investigators observed various emails from Melvin Brewing Company, LLC representatives in which FILLERS was listed as a "Series A Unit" holder with Melvin Brewing Company, LLC. Additionally, attached to an email was a document detailing capital investments

made through 2016 by investors. The document showed that FILLERS HOMES held 300,000 units, a 6.97% ownership, in Melvin Brewing Company, LLC as of September 30, 2016. Investigators believe the $300,000 loan from First Community National Bank was used by FILLERS to invest in the Melvin Brewing, Company, LLC.

28. I know from training and experience that drug trafficking organizations utilize real estate and investments to launder the proceeds of drug sales in an attempt to make the subsequent proceeds from the sale of said real estate or stock appear legitimate. I know from training and experience that quitclaiming property is also utilized by drug trafficking organizations to hide the true ownership of property in which drug proceeds have been invested.

29. On November 14, 2019, investigators reviewed bank records from First Community National Bank and learned that FILLERS received two wire transfers from Deschutes County Title Company. The first wire transfer of $10,000 occurred on October 2, 2019, and the second wire transfer of $428,984.87 occurred on November 4, 2019. The wire transfer documents indicated that the funds were proceeds from the sale of 26695 Horsell Road in Bend, Oregon. Investigators know that this property was utilized as a marijuana grow site while owned by FILLERS and believe that the marijuana grown at that site was some of the marijuana distributed by JONES throughout the country.

30. Additionally, investigators observed that on August 26, 2019, FILLERS issued a cashier's check in the amount of $56,000 from one of his FCNB accounts to The Daily Hybrid Real Estate, LLC. According to, Eureka, Perry County, Missouri, records, on August 30, 3019, The Daily Hybrid Real Estate, LLC purchased the properties of 333 and 337 West Main Street, Eureka, Missouri, in one deed for $1,000,000. The Perry County records show that the mailing address for The Daily Hybrid Real Estate, LLC is 218 Pleasant Valley Estates, Eureka, Missouri,

FILLERS' home address. Investigators reviewed records from the Missouri Secretary of State's business search website and discovered that the registered agent for The Daily Hybrid Real Estate, LLC was FILLERS. Investigators searched St. Louis County Missouri property records and discovered that The Daily Hybrid Real Estate, LLC was listed as owner of 333 West Main Street and 337 West Main Street in Eureka, Missouri. The county records also provided satellite image mapping of property line delineations. Investigators observed two residential structures and one outbuilding within the property lines of 333 and 337 West Main Street in Eureka, Missouri. These properties are unoccupied and there are no utilities associated with these structures.

31. I know from training and experience that drug trafficking organizations deal primarily in cash. I know from information gathered throughout this investigation that the JONES DTO has provided large amounts of cash to purchase property as well as had large amounts of bulk cash marijuana proceeds seized over the course of this investigation. I know from training and experience, prior to the laundering of bulk cash drug proceeds, that bulk cash is often secreted in various locations to include vehicles, residences, safety deposit boxes, storage units and other innovative ways to avoid discovery and seizure by law enforcement. I also know that the creation of shell businesses can be used to register property and/or assets obtained through unlawful activity in an effort to hide said assets from law enforcement.

## CONCLUSION

36. Based on the foregoing, I have probable cause to believe, and I do believe, that Bryan JONES, Jeffrey FILLERS and other known and unknown co-conspirators committed conspiracy to launder monetary instruments in violation of 18 U.S.C. 1956(h) and conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C).

**END OF SWORN STATEMENT**

## PENALTY SUMMARY

| | |
|---|---|
| **DEFENDANT NAME:** | BRYAN JONES |
| **DATE:** | December 6, 2019 |
| **INTERPRETER NEEDED:** | No |
| **VICTIM(S):** | No |

**OFFENSE/PENALTIES:**

    **Count 1:** 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C)
              (Conspiracy to Distribute Marijuana)

               0-20 Years Imprisonment
               Up to $1,000,000 Fine
               3 Years to Life Supervised Release
               $100 Special Assessment

    **Count 2:** 18 U.S.C. §§ 1956(h)
              (Conspiracy to Launder Monetary Instruments)

               0-20 Years Imprisonment
               Up to $500,000 Fine Or Twice The Value Of The Property Involved In The Transaction Whichever Is Greater
               3 Years Supervised Release
               $100 Special Assessment

| | |
|---|---|
| **TOTALS:** | 0-40 Years Imprisonment<br>$1,500,000 Fine<br>3 Years to Life Supervised Release<br>$200 Special Assessment |
| **AGENT:** | Justin Vanderbilt, DEA |
| **AUSA:** | Stephanie A. Hambrick<br>Assistant United States Attorney |
| **ESTIMATED TIME OF TRIAL:** | 5 days or more |

**WILL THE GOVERNMENT
SEEK DETENTION IN THIS    Yes
CASE:**

**ARE THERE DETAINERS
FROM OTHER                No
JURISDICTIONS:**

## PENALTY SUMMARY

**DEFENDANT NAME:** JEFFREY FILLERS

**DATE:** December 6, 2019

**INTERPRETER NEEDED:** No

**VICTIM(S):** No

**OFFENSE/PENALTIES:**

Count 1: **21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C)**
(Conspiracy to Distribute Marijuana)

0-20 Years Imprisonment
Up to $1,000,000 Fine
3 Years to Life Supervised Release
$100 Special Assessment

Count 2: **18 U.S.C. §§ 1956(h)**
(Conspiracy to Launder Monetary Instruments)

0-20 Years Imprisonment
Up to $500,000 Fine Or Twice The Value Of The Property Involved In The Transaction Whichever Is Greater
3 Years Supervised Release
$100 Special Assessment

**TOTALS:** 0-40 Years Imprisonment
$1,500,000 Fine
3 Years to Life Supervised Release
$200 Special Assessment

**AGENT:** Justin Vanderbilt, DEA

**AUSA:** Stephanie A. Hambrick
Assistant United States Attorney

**ESTIMATED TIME OF TRIAL:** 5 days or more

**WILL THE GOVERNMENT SEEK DETENTION IN THIS CASE:**  Yes

**ARE THERE DETAINERS FROM OTHER JURISDICTIONS:**  No